1

2

3

4                         IN THE UNITED STATES DISTRICT COURT

5                     FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7
GLENN FLYNN WILSON,                              No. C 11-5335 SI
8
                    Petitioner,                  **ORDER DENYING PETITION FOR
9                                                WRIT OF HABEAS CORPUS AND
     v.                                          DENYING CERTIFICATE OF
10                                               APPEALABILITY**
ANTHONY HEDGPETH, Warden of the Salinas
11   Valley State Prison,

12                  Respondent.
                                            /
13

14          This is a petition for a writ of habeas corpus filed by petitioner Glenn Flynn Wilson, an inmate

15   of Salinas Valley State Prison, pursuant to 28 U.S.C. § 2254.  For the reasons set forth below, the

16   petition is DENIED.

17

18                                        **BACKGROUND**

19   The California Court of Appeal summarized the facts of this case as follows[1]:

20          Petitioner's case was tried to a jury.  Tambra Jones testified that in August 2005,
     she was seven months pregnant with Wilson's child.  On August 23, Jones met petitioner
21   after school so they could go together to a prenatal appointment.  They argued almost
     immediately about why she had not crossed the street to meet him, and argued again
22   after Jones spoke to a man Wilson did not know.  Jones, who was upset, refused to board
     a bus with Wilson and they separated.  Jones went with a friend, Krystal Thomas
23   (Krystal), to a Church's Chicken restaurant, bought food, and carried it to Krystal's
     nearby home where [Jones] sat on a car in the carport.  Wilson later came to Krystal's
24   house and asked Jones for some of the chicken.  When Jones refused, they argued,
     Wilson grabbed the chicken and pulled Jones off the car, and Jones threw her soda at
25   him.  Wilson removed his wet clothes and then approached Jones, saying he was going
     to "beat [her] ass."  When Krystal tried to separate the two, Wilson cursed at her.
26
            Terence Martin, a Richmond school district employee who happened to be
27   delivering furniture in the area, pulled up in his truck and said something to the effect
     of, "Don't do that.  She is pregnant."  He got out of his truck and argued with Wilson,

28
     ───────────────────
         [1]  The internal footnotes have been omitted and the brackets are from the California Court of
     Appeal decision.

**United States District Court**
For the Northern District of California

telling him to stop what he was doing.  Wilson cursed at Martin and told him to mind his own business.  As Wilson started to walk away, Jones said that Martin choked him with one hand.  Wilson hit Martin's hand away and Martin let go.  They continued to argue, Wilson backed away, and Martin followed him.  They threatened to beat each other up and Martin scoffed at Wilson's threat.  Jones then lost sight of Wilson and heard a gunshot.  When she turned to look, she saw Martin fall to the ground bleeding and saw Wilson running down the street.

Martin was struck by a bullet in the left front upper torso, with the bullet severing his abdominal aorta and exiting his right upper back.  The physical evidence indicated that the shot was fired from a distance greater than five to seven feet.

Lonnie Bynum, a coworker who was in the truck with Martin, testified that Martin got out the truck when he saw Wilson and Jones arguing, stepped between them, and tried to get Wilson into the street.  Bynum did not see Martin put his hands on Wilson.  After Bynum lost sight of Martin and Wilson, he heard a gunshot, saw Martin fall to the ground, and saw Wilson run down the street.

Krystal testified that Martin got out of the truck and told Wilson not to hit Jones because she was pregnant.  Wilson responded by cursing and Martin pushed Wilson in the chest.  (In a pretrial statement, Krystal said Martin grabbed Wilson by the throat.)  Wilson walked away and Martin walked after him.  A bush obstructed Krystal's view of Martin and she turned away.  Within five or 10 seconds, she heard a gunshot and she saw Martin stumble and fall.

Sharlisa Thomas (Sharlisa), Krystal's sister, testified that she saw Wilson shoot Martin from a position in the middle of the street, about eight to fourteen feet from where Martin was standing on the sidewalk.  Wilson extended his arm and fired, and Martin was not doing anything at the time that could be interpreted as a threat.  After the shooting, Wilson cursed, said "my baby, my baby," hit himself on the head with his palm, and shook his head.

San Saechao, a neighbor of the Thomases, heard an argument and looked out his window.  He saw a school district van parked at the corner and a Black male school district employee (Martin) talking to a White male (Wilson).  Wilson was halfway across the street, walking away from Martin who was on the side of the street.  Wilson's face was down and he was shaking his head.  He then turned quickly and fired a shot sideways across his body without taking time to aim.

Wilson testified that he was arguing with Jones in the carport, "this man . . . walked up.  I didn't see him.  I thought it was from behind me. . . . He stepped in front of me and put his hand around my throat."  Martin held Wilson's throat for 20 to 30 seconds.  "I remember him saying her and pointing with his other hand while he had my throat in the right hand like she's pregnant.  And I'm hitting his hand like let me go. . . ."  Wilson said he was "trying to back away at the same time, . . . and [Martin] finally let me go.  My momentum was already moving backwards and he . . . kind of shoved me a little bit."

Wilson looked over his shoulder and saw Bynum standing "rather close.  So . . . I switched my direction towards the stairs," and Martin followed him.  "I felt frightened. . . . I didn't know why he would come up and even put his hands on me like that" and then pursue him as Wilson backed away.  Bynum's presence also scared Wilson because "it was obvious they were kind of together. . . . [¶] . . . [¶] . . . [E]ventually, when I got towards the sidewalk, . . . he kind of stopped.  And . . . I made a couple steps towards his direction to – I was going to get my clothes.  And upon doing that, he – he turned around, [and said,] [¶] . . . [¶] . . . 'Stay your punk ass on the sidewalk.' . . . I may have

said something to him . . . insulting, like 'F you' or something.  But . . . he got aggravated and he said [, 'What?'] Like . . . it was going to be . . . some tension or actual physical fight. . . . [H]e kept moving towards me."

Wilson testified that he looked down and saw the handle of a gun he was carrying in his pocket.  He pulled the gun out and held it in his right hand "[f]acing down towards the cement I was standing on. [¶] . . . [¶] I then . . . recall telling him . . . this has nothing to do with him. . . . [B]ut before I said that, when he saw me pull the gun out, he looked at me and laughed like what the fuck are you going to do with that.  Like I'll make you eat that shit. . . . [¶] . . . [¶] . . . I told him to leave me alone numerous times.  And I told him not to come any closer to me. . . . [¶] . . . [¶] . . . [A]t this time I backed up.  He was kind of moving, and I had backed off."

Wilson continued:  "I don't recall whether it was a whole step or half a step or anything, but I remember I saw [Martin] move quickly in my direction.  And I then kind of – I mean, I moved back and, you know, my hand – I didn't aim it at him or anything, but my hand moved up and I pulled my hand up and upon doing that, the gun went off." Demonstrating his arm position at trial, Wilson held "his upper arm down at his side and cock[ed] it essentially 90 degrees at the elbow."  He testified that he purposely let Martin see the gun in his hand, hoping Martin would turn around and leave.

Wilson's testimony on whether he intended to fire the weapon, or whether he pointed the gun at Martin was equivocal.  When asked by his counsel if he pulled the trigger, Wilson testified, "Uhm, I was holding the gun very, very tight.  You know, the force if I was . . . holding it by me pulling my hand up, you know, I was squeezing it tight enough.  I may have – I don't recall whether I did it on purpose or not, but I wasn't paying attention to what I was doing with the gun at the time.  So I don't recall whether I did it on purpose or not, but I believe I did. [¶] . . . [¶] . . . I did pull the trigger, actually, but I don't recall whether I squeezed on purpose or whether, you know, whether the momentum made the trigger go off or I wasn't paying attention to the actual – actual gun at that point."  After the gun fired, Wilson "was shocked this had happened.  Not only that the gun went off, but . . . that I believed it hit Mr. Martin. [¶] . . . [¶] . . . I got scared and ran away . . . ."  Wilson testified that he did not intend to kill Martin and did not intend to fire the gun.  He testified on cross-examination that when the gun fired he believed he was defending himself from Martin.

*Jury Instructions*

The trial court instructed the jury that Wilson was charged with murder, which occurs when a person "unlawfully kills a human being with malice aforethought." (CALJIC No. 8.10.).  The court instructed that malice is express "when there is manifested an intention unlawfully to kill a human being" (CALJIC No. 8.11), and implied when: "1. The killing resulted from an intentional act, [¶] 2.  The natural consequences of the act are dangerous to human life, and [¶] 3.  The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶]  When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being" (CALJIC No. 8.31; see also CALJIC No. 8.11).

The court then instructed on lesser included offenses, including voluntary and involuntary manslaughter.  "If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the crime charged, you may nevertheless convict him of any lesser crime, if you are convinced beyond a reasonable doubt that the defendant is guilty of the lesser crime. [¶]  The crime of voluntary manslaughter is lesser to that of Murder charged in Count 1. [¶]  The crime of involuntary manslaughter is lesser to that of voluntary

manslaughter. [¶] . . . [Y]ou have discretion to choose the order in which you evaluate each crime and consider the evidence pertaining to it. . . . However, the court cannot accept a guilty verdict on a lesser crime unless you have unanimously found the defendant not guilty of the greater crime." (CALJIC No. 17.10.)

The jury was instructed on the statutory elements of manslaughter. "The crime of manslaughter is the unlawful killing of a human being without malice aforethought." (CALJIC No. 8.37.) "Every person who unlawfully kills another human being without malice aforethought but either with an intent to kill, or with conscious disregard for human life, is guilty of voluntary manslaughter. . . . [¶] There is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion or in the actual but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury." (CALJIC No. 8.40.)  On involuntary manslaughter, the court instructed, "Every person who unlawfully kills a human being, without malice aforethought, and without an intent to kill, and without conscious disregard for human life, is guilty of the crime of involuntary manslaughter. . . .  [¶]  There is no malice aforethought if the killing occurred in the actual but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury. [¶] . . . [¶]  A killing is unlawful within the meaning of this instruction if it occurred in the commission of an act, ordinarily lawful, which involves a high degree of risk of death or great bodily harm, without due caution and circumspection." (CALJIC No. 8.45.)

*Closing Arguments*

The prosecutor urged the jury to convict Wilson of first degree murder.  He argued Wilson acted with express malice, i.e., he fired the gun intending to kill Martin, and with premeditation and deliberation.  He argued Wilson did not act in imperfect self-defense or heat of passion, which he explained would negate malice and made him guilty of voluntary manslaughter instead of murder.  The prosecutor did not discuss involuntary manslaughter in his initial closing argument.

The defense argued that the events of August 23, 2005, were "a perfect storm of tragic coincidence."  He discussed the mens rea of murder and the lesser included offenses.  He described malice, then explained that for voluntary manslaughter the killing may be intentional but the crime is mitigated because the defendant acted in heat of passion or imperfect self-defense. "Now, involuntary manslaughter on the other hand is the unintentional killing of another accompanied by reckless conduct that is not excused." Defense counsel read to the jury the standard CALJIC jury instruction on involuntary manslaughter (CALJIC No. 8.45), which included involuntary manslaughter based on commission of both a misdemeanor and an ordinarily lawful act with criminal negligence, but he did not identify specific misdemeanors or ordinarily lawful acts to guide the jury in its application of the theories.

Defense counsel argued Wilson had an imminent fear of death or great bodily harm after Martin choked him, threatened him, and said he would make Wilson "eat that shit," referring to the gun Wilson had displayed.  He also argued that in these circumstances Wilson's judgment was clouded by passion triggered by sudden quarrel, emphasizing that the whole incident took place in a few minutes or even less than a minute.  He argued that the shooting was not intentional.  Wilson "had that gun in his hand and the gun was shaking and he gripped that gun tightly and when he thought what was an aggressive motion, he reacted and the gun went off."  He asked the jury to consider, "Was Glenn Wilson trying to kill somebody when a single shot was fired and he stood there in the street afterwards shaking his head? . . .  [¶]  Had he really wanted to kill the man, . . . he could have fired the gun a few more times or he might have raise[d] the level up a little bit. . . .  [I]t was a single shot and that gun had more bullets

4

in it. . . . Was it pulled intentionally? That's a big and important question for each and every one of you folks." Defense counsel concluded, "Glenn Wilson is not guilty of murder. Glenn Wilson is not guilty of voluntary manslaughter unless he intended to kill this man or did a deliberate act that killed with a conscious indifference to human life. He is not guilty of involuntary manslaughter unless he was acting unlawfully when that gun discharged and was not acting in self-defense."

In rebuttal, the prosecutor told the jury, "I didn't talk about involuntary manslaughter [in my initial closing argument] because I didn't think [defense counsel] was going to, but he did. Although it was kind of interesting to me that as he is talking about it, there is [ sic ] blanks that are on his page. And he didn't give you any theory [about it], did he? [¶] . . . [S]ince he mentions it I'm going to give it about the 30 seconds that it's worth. Involuntary manslaughter is an act ordinarily lawful that's committed without due caution and circumspection. Okay. It's an act ordinarily lawful basically with criminal negligence. So, [defense counsel], . . . why don't you tell us what act that's ordinarily lawful it is that your client was in the process of committing that approximately [sic] resulted in the death of Terence Martin? If there isn't one, involuntary manslaughter doesn't apply. [¶] [Defense counsel] didn't go there. He left you with a piece of paper that had blanks on it and left it at that basically to leave you to your own devices."

*Jury Verdict and Sentencing*

During deliberations, the jury asked for "clarification of the term 'intentional act' pertaining to malice as defined in section 8-11 [ sic ]." The court asked the jury to be more specific, and the jury responded, "Is pulling out a gun and firing it an intentional act?" The court responded, "Either of those actions, if you find them proved, could qualify as an 'intentional act.'" The jury also asked for a read-back of "testimony of the events right before the gun shot was fired" from Sharlisa Thomas, San Saechao, and Wilson.

The jury returned a verdict of second degree murder and true findings on the allegations that he personally used and personally and intentionally discharged a firearm, causing Martin's death.

Wilson asked the court to modify the verdict to voluntary manslaughter pursuant to section 1181, subd. (6). He also moved for a new trial on the ground that the court should have instructed the jury, in response to their inquiry about whether pulling out or firing the gun was an intentional act, that it had to unanimously agree on which event was the intentional act that supported the second degree murder conviction. The court denied the motion. The court sentenced Wilson to imprisonment for a term of 40 years to life.

*People v. Wilson*, A120725, 2010 WL 1842444, at *2-6 (Cal. Ct. App. May 10, 2010).

On May 10, 2010, the California Court of Appeal affirmed the judgment on direct appeal, and on August 11, 2010, the California Supreme Court denied review. Petitioner did not seek collateral review in the state courts.

Petitioner filed this petition for writ of habeas corpus on November 2, 2011, claiming that he was denied his Sixth and Fourteenth Amendment rights to present a complete defense because the trial court

5

made several instructional errors.  Specifically, petitioner asserts that the trial court: (1) improperly instructed the jury on the lawful-act theory of involuntary manslaughter and instead should have *sua sponte* instructed on the misdemeanor theory of involuntary manslaughter; and (2) improperly instructed the jury that involuntary manslaughter is a lesser included offense of voluntary manslaughter and should have instructed that involuntary manslaughter is a lesser included offense of murder.  In evaluating this petition, this Court reviews the decision of the California Court of Appeal.

**LEGAL STANDARD**

This Court may entertain a petition for writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a State Court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  A federal court may grant such a writ to a state prisoner only if the state court's rulings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States," or were "based on an unreasonable determination of the facts in light of the evidence presented" in the state court.  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing  legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id*. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id*. at 409.  Any determination of a factual matter made by a state court

1    is presumed to be correct, but can be rebutted by the petitioner through a showing of clear and

2    convincing evidence.  28 U.S.C. § 2254(e)(1).

3

4                                        **DISCUSSION**

5    **I.      California Court of Appeal's rulings**

6            Petitioner claims that the trial court violated his Sixth and Fourteenth Amendment rights to

7    present a complete defense because the trial court erroneously gave a jury instruction on the factually

8    inapplicable lawful-act theory of involuntary manslaughter, and that the court should have *sua sponte*

9    instructed on the misdemeanor theory of involuntary manslaughter.  The trial court instructed the jury

10   on involuntary manslaughter based on the theory that petitioner committed a lawful act in an unlawful

11   manner.  Petitioner asserts that the trial court erred in giving this instruction because the undisputed

12   evidence demonstrated that petitioner brandished a firearm at the time of the homicide, which is not a

13   lawful act, but rather a misdemeanor.  Petitioner contends that the trial court should have *sua sponte*

14   instructed the jury on the misdemeanor theory that petitioner committed an unlawful act (brandishing

15   a firearm) not amounting to a felony.  Petitioner argues that the erroneous instruction "effectively added

16   an element to [his] defense by requiring petitioner to show that his act was lawful."  Petition at 27.

17          Petitioner also contends that the trial court erred by instructing the jury that involuntary

18   manslaughter is a lesser included offense of voluntary manslaughter, and that the trial court should have

19   instructed the jury that involuntary manslaughter is a lesser included offense of murder.  Petitioner

20   contends that the instruction impaired his defense because it required the jury to go through a two-step

21   process before the jury could reach an involuntary manslaughter verdict (not guilty of murder, then not

22   guilty of voluntary manslaughter) rather than the one-step process required by the law (not guilty of

23   murder only).

24          The California Court of Appeal found that "the jury instructions by and large accurately

25   informed the jury of the substantive legal standards applicable to Wilson's case."  *Wilson*, A120725,

26

27

28

7

2010 WL 1842444, at *7.[2]  However, the Court of Appeal held that the trial court should have *sua sponte* given an instruction on the misdemeanor theory of involuntary manslaughter based upon the misdemeanor of brandishing a firearm.[3]

> It is settled that a trial court has a *sua sponte* duty to instruct on lesser included offenses whenever "the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) . . .

. . .

> Our Supreme Court has on at least three occasions held that a misdemeanor manslaughter conviction was supported or a misdemeanor manslaughter instruction was warranted where there was substantial evidence that a defendant did not intentionally fire the gun that caused the victim's death. . . .

> Although the People accurately characterize Wilson's testimony as "ambiguous," Wilson testified that he pulled out his gun and displayed it to Martin in order to induce him to withdraw.  Assuming the jury rejected Wilson's claim that he acted in self-defense (a defense theory which would assume an intentional shooting), but nevertheless believed that the discharge was accidental, this testimony established the offense of brandishing. The People concede the point.

> Wilson denied that he intended to kill Martin and he testified equivocally about whether he intentionally pulled the gun's trigger.  He testified in part, "I moved back and . . . I pulled my hand up and upon doing that, the gun went off"; "I was holding the gun very, very tight . . . [and] the force if I was . . . pulling my hand up . . . I was squeezing it tight enough. I may have [pulled the trigger] . . . but I wasn't paying attention to what I was doing with the gun at the time"; ". . . I was shocked . . . that the gun went off." He denied that he "purposefully" pulled the trigger.  Defense counsel argued that the evidence showed that Wilson did not intend to fire the gun.

---

[2] On direct appeal, petitioner challenged the trial court's failure to *sua sponte* instruct on the misdemeanor theory of involuntary manslaughter and the trial court's instruction that involuntary manslaughter is a lesser included offense of voluntary manslaughter. Petitioner did not claim, as he does here now, that the trial court erred by giving the lawful act involuntary manslaughter instruction. Respondent contends that any challenge to the lawful act involuntary manslaughter instruction is barred because it is non-exhausted.  Respondent further argues that the Court can deny the claim on the merits because, *inter alia*, petitioner cannot establish prejudice from the alleged instructional error.  As set forth *infra*, the Court agrees that petitioner was not prejudiced by any instructional errors, and thus the Court does not reach the exhaustion issue.

[3] At trial, petitioner's lawyer requested a misdemeanor manslaughter instruction based on the misdemeanor of possession of a loaded firearm; counsel did not request an instruction based on the misdemeanor of brandishing a firearm. The trial court denied the request for a misdemeanor manslaughter instruction based on the misdemeanor of possession of a loaded firearm, and the California Court of Appeal affirmed that ruling.  *Id*. at *9 ("Wilson directs us to no authority obviating the requirement of a proximate causal connection between the misdemeanor unlawful act and the homicide, and points to no evidence which would establish such a connection here. We conclude that a involuntary manslaughter instruction based on carrying a loaded weapon in a public place was not supported by the evidence.").

8

United States District Court
For the Northern District of California

1
2
3
4

On this evidence, the jury could have found that Wilson killed Martin while committing the unlawful act of brandishing the weapon, but without an intent to kill and without a conscious disregard for human life. Although the People persuasively argue that the evidence also supported a finding of intentional discharge, [internal footnote omitted] the test for instructional error is whether the evidence also would have supported a finding that Wilson did not intentionally discharge the gun. We conclude it did.

5   *Id*. at *8-11.

6
7
8
9
10

With regard to the second claim of instructional error, the Court of Appeal held "we need not decide whether involuntary manslaughter is a lesser included offense to voluntary manslaughter, or as [*People v. Orr*, 22 Cal. App. 4th 780 (1994)] suggests 'merely siblings who have a common parent.' Even if we assume that the result in *Orr* was correct, we conclude post that any error was not prejudicial." *Id*. at *14.

11
12
13
14
15
16
17
18
19
20

The Court of Appeal rejected petitioner's claim that the instructional errors violated his federal constitutional rights. "Wilson has not demonstrated that the trial court interfered with his ability to present his chosen defense to the charges. The only trial court ruling he cites is the court's rejection of a misdemeanor manslaughter instruction submitted on an articulated theory inapplicable to the facts of this case. That instruction was properly refused. Wilson does not contend the court restricted the scope of his closing argument, precluding him from presenting a defense, or that the court misinstructed on the elements of the charged crime, reducing the prosecutor's burden of proof." *Id*. at *15. The appellate court distinguished the cases cited by petitioner, stating, "[i]n the cases cited by Wilson, courts found federal constitutional error where the trial courts denied affirmative defense requests for instructions or precluded evidence in support of a defense theory." *Id*.

21
22

The Court of Appeal also held that any errors in the involuntary manslaughter instructions were harmless.

23
24
25
26
27

We conclude there is no reasonable probability that a different jury verdict would have been rendered had the court instructed on a theory of misdemeanor manslaughter. (*See Breverman, supra*, 19 Cal.4th at p. 149.) A determination that a duty arose to give instructions on a lesser included offense, and that the omission of such instructions in whole or in part was error, does not resolve the question whether the error was prejudicial. (*People v. Moye, supra*, 47 Cal.4th at p. 556.) In determining whether there is a duty to instruct on a lesser included offense we focus on what a reasonable jury could do. On appellate review under *Watson*, we instead focus on "what such a jury is likely to have done in the absence of the error." (*Ibid*., italics added.)

28

9

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Wilson's counsel argued to the jury that Wilson acted lawfully in reasonable self-defense when he drew and pointed a gun at Martin, and that he did not intentionally pull the trigger—that it was a "terrible accident." He argued that Wilson was not guilty of murder or voluntary manslaughter, and that he was not even guilty of involuntary manslaughter "unless he was acting unlawfully when that gun discharged and was not acting in self-defense."

To reach an involuntary manslaughter verdict based on commission of an "unlawful act, not amounting to a felony," the jury would first have had to conclude that Wilson acted without malice, neither intending to kill nor acting in conscious disregard for danger to human life. The jury's questions during deliberations disclose that it was focused on the question of Wilson's state of mind at the time of the killing. The jury asked for "clarification of the term 'intentional act'" in the definition of implied malice (conscious disregard for danger to human life), and when asked to make their question more specific asked, "Is pulling out a gun and firing it an intentional act?" The court responded, "Either of those actions, if you find them proved, could qualify as an 'intentional act.'" The jury then asked for a readback of "testimony of the events right before the gun shot was fired."

By returning a verdict of second degree murder, the jury not only found that the killing was committed with malice, but also obviously rejected the theories that malice was negated by either heat of passion or by any subjective good faith belief in the need for self-defense-precluding either voluntary or involuntary manslaughter. Further, the jury unanimously found true the allegations that Wilson intentionally discharged the firearm, thereby rejecting Wilson's testimony about how the weapon was fired, and precluding any basis to find the predicate misdemeanor of simply brandishing the gun requisite to his theory of involuntary manslaughter. The verdict reflects a determination by the jury that Wilson pointed a loaded firearm at the victim without justification or excuse and intentionally pulled the trigger, actions constituting at least implied malice, even in the absence of an intent to kill.

Wilson argues the jury may have felt pressured into convicting him of murder in the absence of an involuntary misdemeanor manslaughter instruction, because, having apparently rejected his claim of self-defense (perfect or imperfect), the jury was faced with an all-or-nothing choice of convicting Wilson of murder or acquitting him. Wilson correctly notes that the *sua sponte* duty to instruct on lesser included offenses is designed to avoid just this kind of all-or-nothing choice. The rule "prevents the 'strategy, ignorance, or mistakes' of either party from presenting the jury with an 'unwarranted all-or-nothing choice,' [and] encourages a 'verdict . . . no harsher or more lenient than the evidence merits' [citation], and thus protects the jury's 'truth-ascertainment function' [citation]. . . . [¶] . . . [T]he rule seeks the most accurate possible judgment by 'ensur[ing] that the jury will consider the full range of possible verdicts' included in the charge, regardless of the parties' wishes or tactics. [Citation.]" (*Breverman, supra*, 19 Cal.4th at p. 155, first ellipsis in original, italics omitted.)

In the first instance, these were not the only choices for the jury, since a heat of passion theory for voluntary manslaughter was also presented and argued. Had the jury wished to exhibit lenity it had ample opportunities to do so. Further, the jury finding that Wilson intentionally discharged the weapon could not have been the result of pressure posed by an all-or-nothing choice because the jury had the option of finding Wilson guilty of second degree murder without also finding the allegation—inconsistent with the absence of malice—to be true. There was no reasonable probability the verdict would have been different had the jury been instructed on a misdemeanor manslaughter theory.

United States District Court
For the Northern District of California

1
2
3
4
5
6
7

> For similar reasons, we find that any alleged error in instructing that involuntary manslaughter was a lesser included offense of voluntary manslaughter could not have affected the verdict. (*Watson, supra,* 46 Cal.2d at p. 836.) Wilson argues that the error required the jury to go through a two-step process to reach an involuntary manslaughter verdict (not guilty of murder, then not guilty of voluntary manslaughter) rather than the one-step process required by the law (not guilty of murder only). However, he does not explain why this made any material difference. To reach either voluntary or involuntary manslaughter, the jurors would have had to find that the People had failed to prove beyond a reasonable doubt that Wilson acted with an intent to kill or with conscious disregard for danger to human life. They did not. The jury rejected any theory of manslaughter, either voluntary [internal footnote omitted] or involuntary, and consequently did not even need to reach what Wilson posits as the "first step" to consider any lesser verdict.

8   *Id*. at *16-17.

9

10   **II.    Analysis**

11        A challenge to a jury instruction solely as an error under state law does not state a claim

12   cognizable in federal habeas corpus proceedings. *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).

13   Federal habeas relief is available for instructional error only if the error "'so infected the entire trial that

14   the resulting conviction violate[d] due process.'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)

15   (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *see Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

16   In addition, a defendant generally is entitled to have the jury instructed on his defense theory, but

17   whether a constitutional violation has occurred in the failure to do so will depend on the evidence in the

18   case and the overall instructions given to the jury. *See Duckett v. Godinez*, 67 F.3d 734, 745 (9th Cir.

19   1995). There must be some evidence to support the instruction in order for there to be a duty to instruct.

20   *Id.* at 743; *cf. Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000) (failure to instruct on simple

21   kidnapping was error where defendant wanted to present a defense that he kidnapped but not for the

22   purposes of robbing the victim); *Solis v. Garcia*, 219 F.3d 922, 929-30 (9th Cir. 2000) (no duty to

23   instruct on voluntary manslaughter as lesser included offense to murder because evidence presented at

24   trial precluded a heat of passion or imperfect self-defense instruction; no duty to instruct on involuntary

25   manslaughter because evidence presented at trial implied malice).

26        Petitioner argues that the instructional errors violated his constitutional right to present a

27   complete defense because the jury was instructed on the factually inapplicable theory of lawful act

28   involuntary manslaughter rather than on the misdemeanor manslaughter theory of involuntary

**United States District Court**
For the Northern District of California

1  manslaughter. Petitioner argues that the errors were compounded by the trial court's instruction that

2  involuntary manslaughter is a lesser included offense to voluntary manslaughter, and thus that the jury

3  was effectively precluded from reaching an involuntary manslaughter verdict.  Petitioner argues that the

4  Court of Appeal unreasonably applied federal law in concluding that there was no constitutional

5  violation because "[t]here is no United States Supreme Court case that holds that there can be no federal

6  constitutional error unless the defendant takes affirmative action. Instead, the focus is on the nature of

7  the deprivation – whether the Constitution guarantees the defendant the thing of which the state has

8  deprived him." Petition at 30:8-11.  Respondent contends that there is no Supreme Court authority

9  holding that a criminal defendant is entitled, as a matter of federal constitutional law, to instructions on

10  lesser included offenses in noncapital cases, and thus that the California Court of Appeal did not

11  unreasonably apply Supreme Court law.

12       The Court finds it unnecessary to decide whether petitioner's federal constitutional rights were

13  violated because, even if there was a constitutional violation, a habeas petitioner is not entitled to relief

14  unless the instructional error "'had substantial and injurious effect or influence in determining the jury's

15  verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328

16  U.S. 750, 776 (1946)); *see also Spicer v. Gregoire*, 194 F.3d 1006, 1008 (9th Cir.1999) (assuming

17  constitutional error and finding it harmless).  If the court is convinced that the error did not influence

18  the jury, or had but very slight effect, the verdict and the judgment should stand. *O'Neal v. McAninch*,

19  513 U.S. 432, 437 (1995).

20       After reviewing the evidence at trial, the jury instructions, and the record of the jury's

21  deliberations, the Court concludes that any instructional errors did not have a substantial and injurious

22  effect or influence on the jury's verdict.[4]  Petitioner testified equivocally about whether he intentionally

23

24       [4] Petitioner asserts that the Court is required to review the record in the light most favorable to
   petitioner. However, petitioner cites inapposite case law regarding the standard of review in a direct
25  criminal appeal.  As the Supreme Court has noted, "[r]ecognizing the distinction between direct and
   collateral review, we have applied different standards on habeas than would be applied on direct review
26  . . . ." *Brecht*, 507 U.S. at 634.  In *Brecht*, the Supreme Court held that a "less onerous" standard of
   harmless error applies to federal habeas review of constitutional error than the standard of review used
27  by state courts on direct review.  *Id.* at 637. On habeas review, "courts do review all the state's evidence
   to determine whether error had a substantial and injurious effect on the jury's verdict." *Sims v. Brown*,
28  425 F.3d 560, 571 (9th Cir.), *amended*, 430 F.3d 1220 (9th Circ. 2005); *see, e.g.*, *Brecht*, 507 U.S. at
   639 (finding harmless error in part because "the State's evidence of guilt was, if not overwhelming,

United States District Court
For the Northern District of California

1   pulled the trigger – he testified both that he did not purposefully fire the weapon and that he shot Martin

2   in self-defense.  5 RT 983-984, 997-998, 1004-1006.  The prosecution also put on evidence that the

3   weapon had a heavy trigger pull – ten and a half pounds – which was approximately double that of the

4   average single action weapon.  4 RT 742-727.  One witness, San Saechao, testified that petitioner was

5   walking away from Martin, then turned around and shot him.  2 RT 265-267.  Another witness, Sharlisa

6   Thomas, testified that she saw petitioner shoot Martin from a position in the middle of the street, about

7   eight to fourteen feet from where Martin was standing on the sidewalk, that petitioner extended his arm

8   and fired, and that Martin was not doing anything at the time that could be interpreted as a threat.  3 RT

9   599-612.  Thus, the record amply supports the jury's verdict of second degree murder.

10      To reach a verdict of involuntary manslaughter based upon the misdemeanor of brandishing a

11   gun, the jury would have to have concluded that petitioner "acted without malice, neither intending to

12   kill nor acting in conscious disregard for danger to human life."  *Wilson*, A120725, 2010 WL 1842444,

13   at *16.  By convicting petitioner of second degree murder, and separately finding that petitioner

14   intentionally discharged the firearm, the jury rejected petitioner's testimony that he did not purposefully

15   fire the weapon, thereby precluding any basis to find the predicate misdemeanor of brandishing the

16   firearm.  Thus, the failure to provide the misdemeanor manslaughter instruction, and the giving of the

17   instruction that involuntary manslaughter is a lesser included offense to voluntary manslaughter, could

18   not have had a substantial and injurious effect on the verdict.

19      Further, as noted by the Court of Appeal, the jury's questions during deliberations show that the

20   jury was focused on assessing petitioner's state of mind at the time of the killing.  *Wilson*, A120725,

21   2010 WL 1842444, at *16.  The jury asked for clarification of the term "intentional act" in the definition

22   of implied malice, and when asked to make their question more specific, asked, "Is pulling out a gun

23   and firing it an intentional act?"  The court responded, "Either of those actions, if you find them proved,

24   could qualify as an 'intentional act.'"  The jury then asked for a readback of "testimony of the events

25   right before the gun shot was fired."  *Id.*  The jury's question during deliberations show that the jury

26   indeed deliberated on whether petitioner subjectively appreciated the risk and intentionally fired the gun.

27

28   certainly weighty"); *Parle v. Runnels*, 387 F.3d 1030, 1044 (9th Cir. 2004) (concluding that error was
harmless where "the prosecution had overwhelming evidence" of intent).

The Court also notes that the relatively short time of deliberations – less than a day and a half – also supports a finding of harmless error.  *See United States v. Lopez*, 500 F.3d 840, 846 (9th Cir. 2007) ("'Longer jury deliberations weigh against a finding of harmless error because lengthy deliberations suggest a difficult case.'") (quoting *United States v. Velarde-Gomez*, 269 F.3d 1023, 1036 (9th Cir. 2001)); *see, e.g., id.* at 846 (jury's deliberation for 2-1/2 hours on illegal reentry case suggested any error in allowing testimony or commentary on defendant's post-arrest silence was harmless); *Velarde-Gomez*, 269 F.3d at 1036 (jury deliberation for 4 days supported inference that impermissible evidence affected deliberations).  Here, the jury began deliberating mid-day on November 30, 2007, and reached a verdict on second day of deliberations, Dec 3, 2007. 2 CT 469, 481-483.

Accordingly, under the *Brecht* harmless error analysis, the Court concludes that any instructional errors did not have a substantial and injurious effect or influence on the jury's verdict.

## CONCLUSION

For the reasons stated above, the petition for writ of habeas corpus is hereby DENIED.  A certificate of appealability will not issue.  Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: February 11, 2013

SUSAN ILLSTON
United States District Judge